Cupps v. Pioneer Canal-Lake Hattie Irrigation District, number 18-8024. Counsel, would you please make your appearance. Good morning. May it please the court. Counsel, my name is Brandon Jensen and I represent the plaintiff's appellant's landowners that live adjacent to the Lake Hattie Reservoir. This case concerns the scope and extent of a federal right-of-way for a reservoir that is situated on federal lands near Laramie, Wyoming. The defendant, the irrigation district, contends that the scope and extent of its right-of-way should be the physical limitations of the reservoir itself. However, the statute at issue in this case, the Act of 1891, its regulations, 100 years of case law, and the defendant's predecessor's and interest-owned statements unambiguously make clear that the right-of-way grant is based exclusively on a map that's submitted to and approved by the Department of the Interior. Section 19 of the Act of 1891. That's the 1915 Act map? Yes. The original map was approved by the Department of the Interior in 1911. Section 19 of the Act of 1891, which is 43 U.S.C. section 947, states that if you want a right-of-way under this Act, you have to file a map with the government and you don't get a right-of-way until it's approved. And the statute says that the same shall be noted on the plats in said office, and thereafter, all such lands over which such right-of-way shall pass shall be subject to the right-of-way. The intention of Congress could not have been more clear. You only get a right-of-way for what is on the map and what is approved by the Department of the Interior. That the boundary of the reservoir should be definitively fixed and described is absolutely required as a prerequisite to approval of the map. Only through approval of a map does the public have definite notice of the boundaries of the right-of-way for purposes of settlement of the public lands. The Act of 1891 was enacted 127 years ago. There is not a single case, state, federal, or administrative, that holds that the scope of the right-of-way is anything other than what was approved by the Department of the Interior. In this case, in 1909, the defendant's predecessor submitted a map and field notes for approval. That map has a definitive boundary line for the scope of the reservoir. Its field notes delineate the exact meets and bounds description of the boundary of that reservoir. The Department of the Interior reviewed the map, approved the map, and put that legal description on its own books and plats for members of the public to review if they're seeking to make use of the public lands for settlement or any other use that's permitted. The statutes from the 1800s that allow for uses and improvements of the public lands are almost all identical. Almost all of them require a map, a survey, and field notes before any use or occupation of the public lands would be permitted. It doesn't matter if it's a ditch, a canal, a reservoir, a road, or a railroad. That's why my brief is so full of so many cases about railroads, because the Supreme Court has taken a lot of effort to deal with the railroads in the 1800s and the early 1900s. The statutes are no different, and the Supreme Court has definitively held that the map that's approved by the Department of the Interior sets the entire scope and boundary of the right-of-way that's given to you. Furthermore, in this case, we attempted to depose members of the Bureau of Land Management to get their opinion on the issue. As you may or may not be aware, that's a lot more difficult than it should be, but the BLM wrote a letter that's in the record that says, You don't need to depose any employee, because this is a really simple question, and the answer lies in the map and the field notes that was submitted in 1909, and in a BLM survey that was done in the 1940s and 50s. Are those congruent? Congruent in what way? Are they the same? Do they show the same line? Yes, in order for the BLM to do the survey in 1949, the instruction specifically required the surveyor to locate the boundary of the reservoir based on the 1909 map. That surveyor's field note specifically says that he went out and he did that. We know he did that because he found monuments on the ground that he attributed to the 1909 survey. He found stakes on the ground that he thought were in the exact location where the original surveyor was plotting the outside boundary of the reservoir. So we know that the BLM in 1949 not only put those lots outside the boundary of the reservoir, but the first thing he did was locate the reservoir. That was his instructions, and that's what his field notes confirmed that he did. And he did that consistent with the map, based upon the map. Well, going to the question of what Congress plainly says, I have some trouble with this 50 feet argument and the fact that supposedly it would only be 50 feet if you need it. When Congress in Section 18 pretty explicitly says, and 50 feet on each side of the marginal limits thereof, which would seem to suggest, well, it's not suggest. It would say that you get a lot of 50 feet without any showing of necessity. Section 18 also says, Your Honor, provided, however, that no such right-of-way shall be located until all maps of location are subject to the approval of the Department of the Government having jurisdiction. We've interpreted Section 18 to say, yes, you're absolutely right. The default position is that you can get 50 feet, but that is subject to government approval of the maps that you've submitted. And in this case, the map that was submitted to the Department of the Interior did not ask for nor request an additional 50 feet. I'd also submit to the court that this is a reservoir where the outside boundary is not a wall, a retaining wall, or some monument of some kind. It's just open ground. There isn't any necessity or any reason for the Irrigation District to need access to those outside boundaries of the reservoir for construction or maintenance. There's nothing to maintain. Well, that begs the question whether they need to show necessity. I mean, when I'm looking at this language about maps, all it says is it's a map requirement. It doesn't say anything about the 50 feet not being within the scope of what we're talking about here. I mean, what language you get out of this provided that, that would suggest that? No such right-of-way shall be so located as to interfere with the proper occupation by the government of any such reservation, and all maps of location shall be subject to the approval of the government. Okay, and so the government, all right, so go ahead from there. So my contention would be that Section 18 says that you don't get a right-of-way if it interferes with any part of how the government's using the land, and the government wants to approve the maps. So the government has the discretion to decide whether or not you need 50 feet or something less or none at all. I would also submit to the court that the regulations that have been in place since the early 1900s have also demanded that an applicant provide an explanation or some sort of necessity in order to receive the additional 50 feet, and those regulations were enacted in 1908, I think, and have not been challenged. There's not a single case that I could find that suggests those regulations were in error or exceeded their authority under the statute. Well, the statute, if the plain terms of the statute are to the contrary, the regulation is not going to trump that, is it? No, you're correct. The agency that's been assigned the jurisdiction overseeing the act, the Department of the Interior, has also interpreted. It's given deference for statutes that it interprets itself, and it has interpreted the statute to say that it requires a show of necessity to get the additional 50 feet. The defendant would have you believe that the map and the field notes are inconsequential, that they are virtually meaningless, that they can build whatever structure they want, the dam height, whatever they want, and that however much land they need to fill in the reservoir is what they should be entitled to receive. I would argue, on the other hand, that the maps and the field notes are the very foundation upon which you achieve a right-of-way under this particular statute. Before my time is up, I also want to make note about the lots that were subdivided and eventually sold to my clients. Those lots were not received under the general homestead laws of the 1800s and 1900s. It's a special statute called the Small Tracts Act, and that allows individuals to come in and buy small five-acre parcels of land from the federal government. But there are requirements, and one requirement in the statute itself says the land has to be vacant and unreserved public land. If it's inundated by a reservoir, clearly it's neither vacant or inundated. So in 1949, clearly the federal government did not think that the right-of-way for the reservoir extended as far as the boundary of those lots. The statute also required use and improvement of those lots before you could buy them from the federal government. And the regulations that apply to those specific lots demanded that you build a house, demanded that you build plumbing and have toilet facilities, that you have garbage disposal facilities, a whole number of items that are clearly inconsistent with a right to flood that land underwater. Well, the question there is the location rather than whether they have the duty to provide those. And the surveyor for the BLM in 1949, when he plotted those lots, his instructions were, and what he did was he made sure those lots were 40 feet away from the reservoir boundary and 10 vertical feet above it. So the federal government went to a great deal of trouble to make sure that those lots were nowhere near the boundary of the reservoir and were well outside. And both experts at trial, my expert and the irrigation district expert, both testified that those lots are in fact 40 feet from the boundary of that line and 10 vertical feet above it. I'd also note that in between the private lots and the reservoir were plotted four additional lots for public access to the reservoir. Those were supposed to serve as a buffer between the private lots and the reservoir and provide access for the public. They were not to be developed in any way. Yet there has been no discussion how or why or under what circumstances the irrigation district feels that they can just simply flood it without seeking permission from the government. Unless you have any further questions, I'd like to reserve the remainder of my time. I had the impression that the original application in 1909 included the approval of the height and ultimate holding capacity of the dam and that that was approved. No. Am I mistaken about that? Yes, your honor. Or at least that was not approved by the Department of the Interior. Those facts come from an application submitted to the state of Wyoming for a water right. But none of that information had been submitted to the Department of the Interior and had no bearing whatsoever on determining the boundary of the right-of-way for the reservoir. There is no indication, there's no testimony, there was no proof whatsoever in this case that any of those documents had ever been submitted to, reviewed, or approved by the Department of the Interior. And our argument would be anything that wasn't approved or reviewed by the Department of the Interior is irrelevant in determining the scope of the size of the reservoir. Was the commission to draw the map anchored in the beginning point at the holding capacity of the dam? Not that I know of. And I would also submit... How did they determine the beginning point for the height of the dam? In order to draw that map, they have to start at the dam and see how far it will flood in the area. And at that time... And how did they determine how high the dam, how high the capacity is? Let me put it another way. Was the map drawn to show the limits of the holding capacity of that dam, which the state of Wyoming had approved? My time is up. May I answer the question? It's my understanding that the dam did not exist at the time the map was prepared. So everything that was prepared was an estimate of where they wanted the dam to lie, and its height, and how much land they thought was going to be encompassed inside the reservoir. There was no existing dam at the time the map was prepared. But was a variable in that decision what they expected to be the holding capacity of the dam? At least that's what I understand in part Judge McKay to be asking. Sure. And the affidavit submitted by the defendant's predecessor in interest was an engineer. And he said, now that the dam is built, and when we fill it to full capacity, it's exactly as it is on the map that was submitted and approved by the Department of the Interior. That was his statement under oath. And the statement of the company that owned the right-of-way at that time. Well, if that's true, then the map conforms to the full capacity of the dam. I think that was the intent, yes. That was the intent that the map apparently, they haven't increased the holding capacity of the dam, they've just held more water, isn't that right? Honestly... They didn't do anything to increase the original holding capacity of the dam. We don't know that. That dam has been constructed and reconstructed on more than one occasion. And the records going back that far, as you can imagine, are not as thorough as we would have liked. My time is up. Thank you. Thank you. If it may please the Court, Counsel, My name is Greg Weiss from Pinson Macmillan LLC in Cheyenne, Wyoming, on behalf of the FOE Pioneer Canal Lake Hattie Irrigation District. I will address a couple of issues that came up by argument by Mr. Jensen. First of all, I absolutely disagree with the idea that I've said the map is inconsequential. That's absolutely not the case. And in fact, if you look at what Judge Skavdahl did at trial, he relied on the map. And in fact, frankly, Judge Skavdahl adopted the plaintiff's theory of the case and disregarded mine in large part. But Judge Skavdahl found the one issue that Judge McKay and Judge Holmes pointed out is that this is an easement for storage of water. And drawing a line on a map gives you a two-dimensional aspect, length times width. You build a reservoir to store water. A reservoir, by definition, has three dimensions. And the one thing that the 1909 map did not have is the elevation of the high waterline of the map. Nor did the BLM survey in 1950 determine that. And in fact, the instructions that the plaintiffs offered showed that the BLM was supposed to determine the high waterline of the lake. And they didn't do that. Judge Skavdahl noticed that. And that's the real problem, are the deficiencies in what the BLM did, is that they were required to go out, determine the high waterline of the lake, and they were supposed to put the boundaries, the northerly boundaries of the cabin lots, at least 10 feet above that high waterline. It didn't happen. Instead, they used the present waterline of the lake at some unknown elevation. We don't know what that elevation was, and yet we know that when they retraced the line from 1909, there were places where that line that they retraced plunged into the water that they were encountering at that time in 1950. And there were other places where the line that they retraced clearly went above the water that they encountered on that day. And that's, frankly, the reason that the district court denied summary judgment two times to the plaintiffs, is because there were fact questions that arose from the deficiencies of the BLM survey. If landowners cannot rely upon the map, then how are they going to go about having any certainty at all in what property they can buy and what property they cannot buy? Great question. And I'll tell you that my theory of the case and the ruling from the district court gives them that exact certainty. What is it? It's that the lake can be filled to an elevation of 7,277 feet, no higher. Under the theory advanced by the plaintiffs, the right-of-way would have elevations that range from 7,282, which is four feet above the spillway of the lake, down to 7,258. The plaintiff's theory does not give anybody any notice of anything. Well, why doesn't it? Because the plaintiff's theory, at least as I understood it, depends on the map. I mean, it may be a wacky map, the map may be incomplete, but it's a map. And it says this defines your universe. Go forth and operate on this universe. Why isn't that noticed? You're exactly right, Judge. And what Judge Skavdal did is he says, okay, the map is important, it's critically important. I agree. But the one thing missing from the map is the elevation of the high-water line. And there's a couple of things that the plaintiff's expert witness acknowledged, is that the line that Mr. Rosecrans drew on the map in 1909 was a level line, meaning it had to be at one elevation. And in 1950, when the BLM went back out and tried to retrace that line, the level line from 1909 was no longer level. And, in fact, Mr. Jones, the plaintiff's only witness, admitted that by 1950 the level line was no longer level. Why is that? It's because of erosion. Erosion happens in any type of body of water. And so I agree that everyone needs certainty, but the map by itself shows two dimensions, length and width. It does not show the elevation of the high-water line. But if the high-water line will shift, then people who are buying property will never have certainty because, to your point, there's erosion. So how does one ever know with definiteness that when I buy this property it will never be flooded? Because I know that this is the way it's going to be. Your Honor, the high-water line will never shift. It can't. It's fixed at the high-water line of the lake. So what has shifted here, then? What has shifted here is that because of erosion, there are places where the bank has eroded away and it's deposited sediment in one part of the lake and washed away lands in the other. But the map by itself doesn't answer all the questions. It's clear that under the statute, the easement is to store water. And if you don't figure out what's the third dimension, you're not giving certainty to anyone. Well, the retort that one might raise to that is simply the notion of whether this easement was to store water, and therefore, consistent with the questions Judge McKay and I were asking, a variable in that is how much water can be stored. The point is, the statute, once the map is fixed by the government, it's irrelevant. I mean, it may be a lousy map, it may be a bad map, but why doesn't the statute, by its plain terms, make the map determinative? And if we ever had to wonder, you look at the land decisions that have followed from that, which seem to have made the map determinative. So the question is not whether it's optimal. The question is, is this the statutory command that we look at the map and render it dispositive, not just relevant? Well, as I pointed out, Judge Skavdahl used the plaintiff's theory and relied upon the map. The one thing he found wanting, but which the plaintiff's own expert says was important to know, is what was the intended high water elevation. Without that. But that's not on the map. The theory makes total sense to me, and I understand why the high water mark would give certainty. But the map, as described in the statute, doesn't indicate that it's to indicate the high water mark, and the map itself did not indicate the high water mark. And we're making some assumptions here that all make sense, I guess, but I'm confused, like Judge Holmes, as to why the map doesn't control just as the statute says it does. Even if common sense would say this should all be controlled by the elevation, by the high water mark, and not just length and width and a two-dimensional boundary. Well, a two-dimensional boundary doesn't account for the fact that this is an easement to store water. And the plain language of the statute says, the statute shall not be construed to interfere with the control of water for irrigation and other purposes under authority of the respective states or territories. By definition, the statute takes account of the fact that it is meant to be a three-dimensional body of water. It's right in the statute, and if you're going to give the statute effect, you have to give effect to all parts of the statute. I think we can agree with that. But the map that actually gets drawn doesn't indicate the three-dimensional aspects of it. Could it have? Couldn't it have indicated somehow that the elevation mark is the high water mark and that's how it's going to be determined from here on forward? Well, it didn't indicate the high water line elevation. But what it did do is – Could it have? Could it have? Oh, yes, it could have. Right, and it didn't. It didn't. But the problem is, maybe the map is less than perfect, but we have a situation where – It's the map that was approved. It's the map that was approved. By the interior. That's what controls. I agree it controls. Even if it is less than perfect. And the only way that the court could determine whether or not there had been a trespass that took place was to determine what the intended elevation was of that line. The plaintiff's own experts said that even under their theory of the case, half of the plaintiff's lots were subject to inundation by the right-of-way. Here's the real problem. It's the BLM survey from 1950. It was completely ineffective. It was full of mistakes. They didn't determine the high water line of the lake. They didn't follow the BLM manual that said for a non-navigable body of water, such as Lake Hattie Reservoir, you are to determine the boundary of the reservoir by looking to state law. In Wyoming in 1933, the Wyoming Supreme Court said, for easements for reservoirs under the Act of 1891, you are to treat the line on the map as a meander. As a meander. And the law is clear, state and federal law. A meander line is not the boundary. It shows the water line at one point in time. And the Supreme Court in 1891, same year as the statute in question said, quote, it has been decided again and again that the meander line is not a boundary, but that the body of water whose margin is meandered is the true boundary. Mitchell v. Smale, 1891. And so the BLM surveyors that created the cabin lots didn't follow their own manual that said you must go look at state law to determine the reservoir boundary. They didn't do it. Not only that, they used the present water line at some unknown elevation. And if they would have determined the high water line, we wouldn't be here today. Because that high water line is 7278. The spillway of the reservoir is 7278. And by definition, the lake can't hold more than that. It spills out of the lake. The real problem is that the BLM didn't accomplish its own goals when it set about creating the cabin lots built on the shore of Lake Hattie. And the plain reality is that the patents to the plaintiff's properties make it clear that their title is subject to three things. One, water rights. Two, rights to ditches and reservoirs. And three, a right of way for reservoirs is expressly reserved in the patent that's provided to the plaintiffs. It's in their title. A right of way for reservoirs. A right of way for a reservoir. But then that brings us back to the question of what is the determining factor as to that right of way. And if the determining factor as to that right of way is the map, then their property is consistent with the right of way. Whose property, Your Honor? Landowners. Well, it is consistent with the right of way from the standpoint that their lots are subject to a flow ageasement to an elevation of 72-77 as Judge Scavdahl determined. No, I guess what I, and perhaps what I'm saying is that if it's subject to the right of way and the right of way is determined by the map, then the map would not allow for this flooding that is taking place, would it? Well, I have to disagree that any flooding has taken place. My client has never, ever stored more water in the reservoir than the high water line. It just hasn't happened. It can't happen. And to answer the question, I believe somebody said, has the configuration of the height of the reservoir ever changed? The evidence at trial from the plaintiff's only witness himself, no, the spillway has never changed. Judge Scavdahl asked my expert, has the spillway elevation ever changed? No, there's no evidence of that. It's undisputed. And I'll note that at the conclusion of trial, Judge Scavdahl asked us to submit, if we could submit more evidence after trial. We submitted Exhibit C2, which is a retracement of the Rosecrans survey from 1909, and it shows the last three calls of his survey being overlaid in the same exact place where the dam is today. The reality is that the reservoir was built. It was built to a certain elevation. That's why reservoirs are built. And if you look at all of the regulations concerning the map, all of them that are cited, even Judge Scavdahl cites them, it says that the line that's drawn on the map is, in fact, the high water line of the lake. It's what it says. So Judge Scavdahl had no way to rule on the case until he determined what that particular elevation was. I argued in an alternative theory that Wyoming law says that the high water line at the meander, or established by the meander originally, is the boundary of the easement. Judge Scavdahl used a plaintiff's own theory and said, okay, I'm going to rely on the map and give it legal effect. But the one thing that he had to do was to supply the elevation. Without that, he could not determine whether a trespass had taken place. And so that's what he did. He used their evidence from their surveyor who admitted at trial that the level line was no longer level by 1950, and that's because it was a meander. We understand your argument. Thank you, counsel. Thank you. You didn't have any time remaining. Well, this case is submitted. Thank you, counsel, for your good arguments. And we are in reset.